UNITED STATES, Appellee

v.

MARION R. VAUGHAN, ARTHUR J. MITCHELL and
THOMAS W. SWANNER, General Prisoners,
U. S. Army, Appellants

3 USCMA 121, 11 CMR 121

No. 788

Decided July 31, 1953

Lt Col James C. Hamilton, U. S. Army, and 1st Lt James A. Hagan, U. S. Army, for Appellants.

LT COL Thayer Chapman, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

On August 3, 1951, the accused, General Prisoners Marion R. Vaughan, Arthur J. Mitchell, and Thomas W. Swanner, all confined in the United States Disciplinary Barracks, New Cumberland, Pennsylvania, were convicted, following common trial by general court-martial, of escape from confinement—Charge I and the specification thereunder—and willful destruction of Government property—Charge II and its specification—in violation of Articles of War 69 and 96, respectively, 10 USC §§ 1541, 1568. Each accused was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for two years and six months. No evidence of previous convictions was considered. The convening authority approved the findings under Charge I and only so much of the finding of guilty under the specification of Charge II, as to each accused, as finds that he did, at the time and place alleged, willfully, wrongfully, and unlawfully destroy an unknown quantity of fence wire, of some value not in excess of $20.00, property of the United States. In addition, only so much of the sentence was approved as provides for dishonorable discharge, total forfeitures, and confinement at hard labor for one year. A board of review in the office of The Judge Advocate General, United States Army, affirmed the findings and sentence as approved by the convening authority. Petitions of each of the accused for further review by this Court were granted, with briefs and arguments limited to the following issues:

(1) Whether the trial of the accused for escape from confinement constituted double jeopardy.

(2) Whether the trial of the accused for Charge II was a multiplication of charges for a single offense.

(3) Whether the substantial rights of the accused were materially prejudiced when the law officer, in closed session, instructed the court as to the sentence imposable, in the absence of accused and their counsel.

II

We turn first to the question of whether trial of the accused by court-martial for escape from confinement constituted a violation of the former jeopardy provisions of the Uniform Code, supra. It is necessary that certain preliminary facts be related. During the night of May 28–29, 1951, the three accused, who were confined in the New Cumberland Disciplinary Barracks, escaped therefrom by cutting through the main fence surrounding the institution's several buildings. They were returned to military control on May 29, 1951. Two days later each accused appeared before a discipline and adjustment board, convened at the Barracks, to face an accusation of escape. All admitted the misconduct; and the members of the board recommended as punishment forfeiture of good conduct time, fourteen days solitary confinement on restricted diet, and thirty days disciplinary segregation. The recommendations of the board were approved by the Commandant and the mentioned punitive action was thereafter taken. On the basis of these facts, defense counsel at the court-martial trial interposed a plea of double jeopardy—thus raising the issue of whether the punishment meted out to the accused by Barracks officials for the offense of escape from confinement constituted a bar to their subsequent trial by court-martial for the same offense. The law officer denied the plea, and his action has been sustained by the convening authority and a board of review.

So far as procedures are concerned, the action of the discipline and adjustment board and the Barracks Commandant accorded fully with the provisions of applicable regulations promulgated by the Secretary of the Army, pursuant to authority vested in him by Congress. 10 USC Supp V § 1453.

**123**

These regulations are Special Regulations 600–330–1, AFR 125–33, dated May 8, 1951, and Special Regulations 210–185–1, dated May 31, 1951—and it is believed unnecessary to set out their extensive provisions herein. Sufficient general understanding of their relevant terms may be gleaned from a consideration of the action of Barracks officials in this case. However, two brief provisions of controlling significance will be adverted to, when pertinent, in a later portion of this opinion.

In essence, the positions of Government and defense counsel come to this. Defense argues that the basic authority for the first punishment—that imposed at New Cumberland—must be derived from Article 15 of the Uniform Code, supra, and thus the action is subject to the double jeopardy provisions expressed and implied in paragraph (e) of that Article and elaborated in the Manual for Courts-Martial, United States, 1951, paragraphs 68g and 128b. Government counsel, on the other hand, contend that the Barracks punishment was the product of the exercise of a purely administrative function on the part of a prison warden, so as to entail no former jeopardy problem at all. We suspect that the issue is not so clean-cut as either counsel would have us believe, and that the true solution lies somewhere between the two extremes.

There can be no denying the general proposition that those entrusted with the management of a penal ▪ institution must necessarily possess power to impose disciplinary sanctions of a wholly administrative character. The exercise of this authority—again as a general proposition—cannot possibly run afoul of the double jeopardy notion, for the reason that it is not an exercise of anything like *judicial* power. This is the sound import of numerous civilian authorities. See Patterson v. United States, 183 F2d 327 (CA 4th Cir); State v. Cahill, 196 Iowa 486, 194 NW 191; State ex rel Turner v. Gore, 180 Tenn 333, 175 SW 2d 317; State v. Mead, 130 Conn 106, 32 A2d 273. Certainly we are in full accord with the principle of these decisions so long as it is restricted to the setting in which it is cast. However,

**124**

civilian precedents are not necessarily applicable to all punitive action taken by the commandant of a military disciplinary barracks, for—unlike his civilian counterpart, the prison warden—one who occupies the former position plays a dual role. He is at the same time a *prison warden* and the *military commander* set over the men confined in his penal institution. Therefore, he is invested both with the usual powers of a prison warden and also with the authority of a military commanding officer. Conceivably these may be the subject of confusion and require the taking of distinctions.

Both the disciplinary barracks commandant and the persons under his control are subject to the terms of the Uniform Code of Military Justice, as provided in its Article 2(1), (7). The commandant is the commanding officer of the barracks. 10 USC § 1455. Therefore, he has the power to impose all of the so-called disciplinary punishments authorized by Article 15 of the Code, supra. Exercise of this power, of course, may operate to raise questions of former jeopardy. Uniform Code, supra, Article 15(e); Manual, supra, paragraph 68g. Accordingly, there may be conflict in some degree—or, at least, uncertainty—between the commandant's authority under Article 15, on the one hand, and such inherent disciplinary power as he may possess as the warden of a penal institution, on the other. This is true for the reason that the latter, being action of an undiluted administrative character, can, in itself, contain no latent double jeopardy problems.

In the present case, however, there is no real doubt concerning the well of authority drawn on by the ▪ Commandant of the New Cumberland Branch. He did not at all purport to utilize the procedures of Article 15. At this point, therefore, we are required to ask: is the administrative punitive power of the commandant of a disciplinary barracks identical to that of a civilian prison warden? We are sure that it is not. Directives purporting to grant this power, and to delimit it, have been provided, pursuant to Congressional mandate—

with the result that the authority of a barracks commandant, as such, to impose punishment of a purely administrative nature must be limited strictly by the service regulations involved here and cited earlier in this opinion. Turning to this source, we observe that paragraph 50b(11), Special Regulations 210–185–1, supra, expressly provides that:

"Disciplinary action taken by the discipline and adjustment board will not preclude trial by courts-martial . . . if the prisoner is subject to military law and the gravity of the offense merits such action."

It is apparent from the language of this directive that disciplinary action taken under it will preclude subsequent trial by court-martial, if the prisoner is subject to military law, and if the gravity of the offense does not "merit" such trial. Confining ourselves for the moment to that portion of the Regulations just quoted, the question becomes one of whether the offense which was here the subject of disciplinary action—namely, escape from confinement—was of such a nature as to merit a subsequent trial by court-martial for the same offense. Additionally, of course, we must ascertain the identity of the official who is authorized to decide this question in the first instance, and, as well, the extent to which such a determination is subject to appellate review.

It seems clear that the decision as to whether an offense which has been the subject of disciplinary punishment by a military prison commandment "merits" in addition trial by court-martial must—like punishment under Article 15 in some measure—rest initially with the commandant himself, and secondarily with the officer exercising general court-martial jurisdiction over the prisoner concerned. And—since the action of these officers is rooted in the authority vested in them by the Uniform Code and appropriate service regulations—their exercise thereof must be deemed a proper subject for appellate scrutiny, first by a service board of review and thereafter by this Court. The line separating those offenses which "merit"

court-martial action, in addition to disciplinary punishment, from those which do not, should not be vague or meandering—for the problem, in so far as possible, demands clear demarcation as a predicate to uniform administration. The matter cannot, therefore, be said to rest in the unbounded discretion of any functionary.

It has been demonstrated that there is much similarity between the action of a commanding officer under Article 15, and that of a military prison commandant, through his disciplinary and adjustment board, under the Special Regulations cited above. Certainly, it is fair to say that the power conferred in both directives is essentially similar and derives from an identical juristic source. It is, therefore, probable that we would not go far wrong were we to assimilate a discrimination between grave offenses which "merit" court-martial action, and others which do not—under the Regulations—to the distinction between "major" and "minor" offenses—as delineated in the Manual with respect to Article 15 of the Code.

Defense invokes the Manual, supra, paragraph 128b, to establish that, under Article 15, escape from confinement may be regarded as either major or minor, depending on surrounding circumstances. Thereafter it is argued that, having elected to treat the offense as minor, the prison commandant should be held to his election. This would doubtless settle the matter if we were dealing in this case with an Article 15 problem. Unfortunately for this position, however, we are not; quite obviously we are treating of a Special Regulation situation.

On the other hand, the Government quotes from Special Regulations language to demonstrate that, at least for certain purposes in the sphere of prison problems, escape from confinement is to be regarded as a "major" crime—and in this respect we are sure that its counsel have the better of the bargain. Certainly, Special Regulations 210–185–1, supra, paragraph 50b(3), provides:

"(3) *Major violations.* When a prisoner commits a major violation, a disciplinary report covering the vio-

**125**

lation in complete detail must be submitted in writing in each instance. Samples of major violations are—

(a) Attempting to escape."

Conceding that escape from a division or post stockade may under some circumstances properly be regarded as a minor offense, we cannot think this view may be defended as to an escape from a military prison. The former place of confinement includes persons of varying conditions of servitude, whereas in the latter are found only convicted criminals—in fact those guilty of relatively serious crimes. Their continued safe incarceration goes to the very heart of the commandant's responsibility, and constitutes the principal raison d'etre for a disciplinary barracks. To characterize escape from such an institution as a peccadillo is to talk nonsense—and the Regulations do not at all speak in this vein. We conclude, therefore, that the escape from confinement of interest to us here was a major offense which "merits" court-martial action, and that as to it the prior administrative punishment supplies no bar. This conclusion, we believe, is required by both regulations and Federal law.

Appellate defense counsel have suggested that the administrative punitive action against these ac- ■ cused taken by the military prison commandant, through his disciplinary and adjustment board, exceeds that permissible under the appropriate Regulations. Conceding this to be true—and it may or may not be the case—we cannot see that it should affect in any respect the outcome of the present appeal. If the officials of the disciplinary barracks exceeded their authority in fact, and violated regulations set up for their guidance, their conduct is open to various sorts of action—both practical and legal—on the part of their superiors. However, as we view the matter, it cannot touch the amenability of these accused to trial by court-martial. Cf. People v. Defore, 242 NY 13, 150 NE 585.

If we understand them correctly, it is vehemently asserted by Government appellate counsel that to hold any sort of administrative punishment imposed by the commanding officer of a disciplinary barracks a bar to subsequent trial by court-martial would be fatally to cripple prison commandants in the exercise of the disciplinary aspects of their office. If this is what they mean to say, we do not agree with them at all. The argument is directed in this instance, we believe, to what is wholly a bugaboo, and we do not see that their fears are in any way justified. Some prisoner offenses are grave and "merit" trial by court-martial despite prior disciplinary action. Others are venial—and as to them court action is barred by earlier administrative punishment. This answer is furnished alike by reason and regulations. While care should be exercised to appreciate fully the peculiar character of the prison commandant's task and responsibilities and the demanding nature of his problems, we would not hesitate in a proper case to hold trial by court-martial barred in a setting similar to the present one. We would do this freely because—if for no other reason—it is directed by service regulations.

III

It has been reported earlier that Charge I alleged an escape from confinement against the accused, ■ and Charge II the willful destruction of Government property. The latter consisted of the severance and consequent destruction of an undisclosed quantity of wire fencing during the escape. It is urged that the trial on the specification of Charge II, considered in conjunction with the offense alleged under Charge I, constituted a multiplication of charges covering what is in point of fact a single crime.

A precise analysis of the elements of these two offenses is hardly necessary to demonstrate their obvious separateness. Each is manifestly distinct from the other—although the destruction of the property in question occurred during, and in aid of, the escape from the Disciplinary Barracks. Consequently, if the present problem permitted a determination on the basis of the provisions of the 1951 Manual alone, there could be no doubt concerning the outcome. See Manual, supra, paragraphs

74c(4) and 76a(8). However, the destruction of property was certainly an *aspect* of the escape, thus bringing to bear that portion of paragraph 80a, Manual for Courts-Martial, U. S. Army, 1949, which provides that:

"If an accused is found guilty of two or more offenses constituting different aspects of the same act or omission, the court will impose punishment only with reference to the act or omission in its most important aspect."

In view of the fact that the misconduct with which we are concerned in the case at bar transpired prior to May 31, 1951, the effective date of the Uniform Code, supra, the foregoing language must be regarded as applicable here, since it more severely restricts punishment than do the provisions of paragraph 76a(8) of the current Manual. See United States v. Emerson (No. 77), 1 USCMA 43, 1 CMR 43, decided November 14, 1951. It will be recalled that the 1951 Manual permits the imposition of the maximum punishment, as set out therein, for each one of several separate offenses, without regard to whether they all may constitute but different aspects of a single criminal transaction.

It appears that the maximum punishment applicable to escape from confinement is identical under both the 1949 and the current Manuals, namely: dishonorable discharge, total forfeitures, and confinement at hard labor for one year. See 1949 Manual, supra, paragraph 117c, Table of Maximum Punishments; 1951 Manual, supra, paragraph 127c, Table of Maximum Punishments. This is the very sentence now outstanding against the accused, approved by the convening authority and affirmed by a board of review. In the ordinary case, therefore, it would be necessary to scrutinize with care the post-findings conduct of the court-martial, together with any instructions of the law officer as to sentence and the later actions of the convening authority and board of review, for the purpose of determining the legality of the punishment imposed. Here, however, and for the reason that the case must be reversed and reheard on another ground, such a course would serve no purpose of practicality.

## IV

It appears from the record that following the court-martial's return of findings of guilty, and argument by defense counsel relating to sentence, the members of the court retired to deliberate on the punitive action to be taken. Thereafter—the record recites—the law officer, together with "the members of the defense and prosecution and the three accused" were called before the court to enable the law officer to "advise the members as to what punishments . . . might be considered by the court." The law officer "advised the court what things to consider" and, with the others, thereupon withdrew. However, a Certificate of Correction, executed some two months after termination of the trial, is appended to and made a part of the record. Signed by the law officer and the president, as well as by the three accused persons—but apparently phrased only in the words of the president—this curious document avers that in fact the law officer-court conference transpired in open session. However, it appears to have taken place "immediately at the bar of the court and could not have been heard distinctly by any personnel who may have been seated at the tables for the prosecution, defense and the reporter." The certificate continues as follows:

". . . The substance of the discussion between the law officer and the members of the court was that the court inquired whether the property set forth in Specification of Charge II could be considered as private property inasmuch as this offense was listed under Article of War 96. The law officer instructed the court that the court could not consider such property as being private property. The court then inquired of the law officer whether as a guide for punishment with respect to Specification of Charge II, whether the court could be guided by the punishment set forth in the table of maximum punishments, Manual for Courts-Martial

**127**

1949, which punishment is listed under Article of War 83 inasmuch as that Article pertains to military property. I do not recall the response of the law officer; however, based on the subsequent action of the court in considering the punishment set forth in the table of maximum punishments under Article of War 83, in the Manual for Courts-Martial 1949, I can only conclude that his response was affirmative. The law officer further instructed the court that the accused were charged with offenses under Manual for Courts-Martial 1949 and the applicable sentences therefore must be governed by the provisions of the old manual unless an advantage or benefit may accrue to accused for the provisions of the 1951 Manual for Courts-Martial. I have discussed with other members of the court and I, as they are, am unable to recall that the law officer instructed the court in substance that the punishment may only be adjudged for that charge and specification which is the more serious of the two because both offenses arose out of the same action or transaction.

"After the discussion between the law officer and the members of the court, immediately at the bar of the court, which has been hereinbefore been set forth in substance, a substance of this discussion was then announced while the court was in open session. The defense counsel was queried whether he was satisfied that the rights of the accused had not been prejudiced by this discussion. I do not recall his reply."

In concluding, the certificate admits candidly that, ". . . [T]he reconstructed language and incidents that occurred are the best that can be obtained from memory."

Now, the fact that the conference was held in the room in which the accused and their counsel were seated cannot remove this case from the ratio of other closed-conference opinions heretofore rendered by this Court. United States v. Taborn (No. 1282), 3 USCMA 61, 11 CMR 61, decided July 17, 1953, and cases there cited. Held out of the effective range of hearing of accused and their counsel, the conference was as fully closed as if it had been held in a separate room. In truth, the procedure followed here was perhaps even more objectionable than that utilized in most similar cases in that the reporter was substantially excluded from the gathering.

We have recently established our basic views concerning conferences between the court and the law officer, during deliberations on the findings and sentence, outside the presence of the accused and his counsel. United States v. Miskinis and Pontillo (No. 1535), 2 USCMA 273, 8 CMR 73, decided March 5, 1953, and authorities therein cited. These require reversal in the case before us now. As an additional reason for this action, however, it may be said that we cannot really know what went on in the conference with which we are here concerned. Of course, this is not in any slightest sense intended to reflect on the officers who joined in the Certificate of Correction, but rather suggests only that in executing it they were required to draw heavily on recollection in describing events which took place many weeks earlier, and probably were not regarded as being of much importance at the time. Being honest men, they fairly and clearly expressed in the language of the Certificate something less than certainty and positiveness. Surely, what we have before us is much less than a transcript of the proceedings in question. Because of this, it cannot be said that there was no fair risk of prejudice—that is, *specific* prejudice—to the accused. It is clear that the Government did not sustain any burden which may have rested on its shoulders to establish that what transpired during the closed conference did not operate to accused's detriment. Indeed, and in the nature of the situation, its representatives can hardly have been expected to do so.

Previous decisions of this Court require the direction of a rehearing.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I concur generally in that part of the opinion which holds the accused have not been twice tried for the same offense. I again dissent on the closed conference issue. My associates approach closely the concepts I set forth in my dissent in United States v. Woods and Duffer (No. 1023), 2 USCMA 203, 8 CMR 3, decided February 19, 1953, but here the conference was held after findings of guilt. Assuming the accused were prejudiced by the discussion they are not entitled to a rehearing on the merits. At most they should be given only the benefit of a reconsideration of the sentence.