UNITED STATES, Appellee

v.

CLAUDE SELF, JR., Seaman Apprentice, U. S. Navy, Appellant

3 USCMA 568, 13 CMR 124

569

LCDR John J. Nelson, USNR, for Appellant.
CAPT Carl G. Lutz, USMCR, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was tried by a Navy special court-martial at San Diego, California, on February 7 and 8, 1952, for stealing five pistols from a fellow seaman in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. The court found him guilty of wrongful appropriation and sentenced him to a bad-conduct discharge and confinement at hard labor for six months. The sentence was approved by the convening authority, but mitigated by the general court-martial authority to a bad-conduct discharge. A Navy board of review affirmed. We granted review to consider the following issues:

"(1) Whether the appearance at the trial of the legal officer for the convening authority was prejudicial to the accused.

"(2) Whether the record of trial complies with the requirements of Article 19, Uniform Code of Military Justice."

When trial counsel called his first witness, defense counsel interrupted. The record recitals of this interruption constitute the foundation for the claims of error.

"DEFENSE COUNSEL: If it please the court, before the witness is called, Mr. Millard may be a witness for the defense—not as to the guilt or innocence of the accused, but on a collateral issue. I would like to inquire of the court whether his presence may be maintained in court or not.

"PRESIDENT: You are going to call him as an expert witness?

"DEFENSE COUNSEL: No sir, not as an expert witness but he will be called on a collateral issue—not on the main issue of the case—of the guilt or innocence of the accused.

"PRESIDENT: Is it you [sic] desire that Mr. Millard not be present?

"DEFENSE COUNSEL: I have no desire that he be not present.

"PRESIDENT: Do you feel that his presence in any fashion would jeopardize the rights of the accused?

"DEFENSE COUNSEL: I do not.

"Lieutenant Commander John W. Millard, U. S. Naval Reserve, Legal Officer, U. S. Naval Amphibious Training Unit, was present in court as a spectator."

The structure erected on this foundation consists of two like incidents which took place in the course of testimony of two prosecution witnesses.

The first of the incidents occurred during the testimony of the owner of the allegedly stolen property. He had testified that he returned from temporary duty in the early morning of the events in issue. After reveille, he displayed the guns to "a lot of men" in the barracks. Before going to quarters, he locked the guns in his suitcase and placed the suitcase and his duffel bag on a bunk. On his return to the barracks about four hours later he noticed that, while the suitcase was closed, the locks had been "jimmied." He opened the suitcase and discovered that the pistols were missing.

Having identified the missing pistols by model and manufacture, the witness was shown Prosecution Exhibits 2 and 3 for Identification. These exhibits were receipts from a gun shop and a sporting goods store, respectively, with

the name of the witness appearing as the purchaser in each. When the witness stated that he recognized the receipts, trial counsel offered them in evidence. Defense counsel objected on the ground of hearsay. Trial counsel argued that they were admissible as business entries. At that point, the record contains a reporter's note as follows: "There was a discussion between Lieutenant Commander Millard and the members of the court and personnel of the prosecution."

Nothing of the discussion appears in the record. However, subsequent proceedings in revision, which were ordered by the convening authority and to which later reference will be made, records what was said as being "substantially" as follows:

"PRESIDENT: Do you have any information on the subject of admissibility of hearsay evidence of this type?

"LIEUTENANT COMMANDER MILLARD: The rule governing situations such as this is stated in Chapter 27, Manual for Courts-Martial, 1951, paragraph 144c page 266, which has to do with business entries."

The record of trial shows that, after the discussion, trial counsel read paragraph 144c of the Manual for Courts-Martial, and the president then asked defense counsel if he had any objections. Defense counsel replied that he had none. The receipts were thereupon admitted in evidence.

The second of the incidents arose when a prosecution witness sought to testify regarding the search that was made for the missing pistols. Defense counsel objected on the ground that the search was illegal. He requested permission to introduce evidence to prove his claim. The objection was overruled and the request was denied. However, counsel persisted; he maintained that, if the questioning as to the search were allowed to continue until the point of discovery, the accused would be greatly prejudiced. Here again the record shows the reporter's note of an unrecorded conference with the unit's legal officer. This conference was between the president and Lieutenant Commander Millard. The substance of this conference is also reported in the record of the revision proceedings. It is shown as follows:

"PRESIDENT: Is it permissible for the court to request more information relative to the question in hand?

"LIEUTENANT COMMANDER MILLARD: Yes, you may call for more information or further argument from the counsels."

On completion of his consultation with the legal officer, the president heard further argument from defense counsel on the claim of illegality of search. The defense was then permitted to introduce testimony in support of its claim. Commander Millard was called as one of the defense witnesses to testify to facts regarding the authority of the person who ordered the search to take such action. Ultimately the issue was resolved against the accused, and evidence of the search was admitted. This established that the pistols were found in a cardboard box in the accused's locker several hours after they were reported to be missing.

The accused testified at the trial. On the morning of the events, he was to move from one barracks to another. About 10:30 he went to his former barracks to collect his things. As he entered, he noticed a man, whom he did not recognize, going out at the far end. He then saw that the suitcase had been tampered with. It was open about two inches at one end. A gun showed through the opening. The accused unlocked the other end, searched through the suitcase, and found the five pistols. He examined the remaining contents and found a billfold containing an identification card bearing the name of the owner, Seaman Hansen. He replaced the billfold, but put the guns into a box, and took them with him when he left the barracks. He proceeded directly to his new barracks, and placed the box containing the pistols in his own locker.

The accused asserted that he took the guns from the suitcase in order to "deprive the man that was after them from getting them." At no time did he ever intend permanently to deprive the owner of them. He did not, however, report

**571**

the incident to anyone in the hours before the search because he "didn't want to start a commotion," and he feared that he would be accused of stealing the guns. He asked no one about a Seaman Hansen, but while he was on watch at his new barracks, which was about fifteen yards away from the other, he stood at the door looking for a stranger whom he would know to be Hansen, since he knew everyone else in his former barracks. He was prompted not to lock the suitcase without taking the guns because he "was afraid that somebody would take them anyway" after he left. However, he left behind him the suitcase and its remaining contents, and an open duffel bag, which he knew contained a camera, because he "figured the pistols were more valuable."

In a number of respects, the accused's testimony differed from that of the prosecution witnesses. Suffice it to refer to only one variance. During the search for guns, the accused was asked by one of the search party whether his locker had been searched. He replied that it had, and pointed to one of the other members of the search party as the person who made the search. However, the latter testified that he passed the accused's locker and saw that he had not removed all of his gear, but at no time did he search the locker.

Following accused's conviction and sentence, the record was reviewed by the convening authority. He noted that the record did not disclose the content of the two discussions with Commander Millard. Consequently, he returned the record to the court-martial for proceedings in revision. Such proceedings were held on April 30, 1952, and supplied the substance of the discussions.

At these proceedings, the accused was represented by the same appointed defense counsel who had represented him at the original trial. Although no member of the prosecution was a lawyer, accused's counsel was a member of the Bar of the State of California and certified by The Judge Advocate General of the Navy in accordance with Article 27, 50 USC § 591. Upon completion of the revision proceedings, the record was

again reviewed by the convening authority. He then approved the sentence.

Our decision in United States v. Nelson, 3 USCMA 482, 13 CMR 38, partially disposes of the ■ ■ claim that the record does not comply with the requirements of Article 19, 50 USC § 579. In that case, we held that the requirement of Article 19, that no bad-conduct discharge be adjudged unless a complete record of the proceedings and testimony before the court has been made, is met if the transcript is "sufficiently complete to present all material evidence bearing on all issues." Here, no issue is made of the sufficiency and accuracy of all of the testimony and proceedings other than the two instances of discussion involving Commander Millard. These deficiencies were substantially supplied in the record of the revision proceedings. Therefore, if the latter can properly be considered with the original record for the purpose of compliance with Article 19, the Nelson case is controlling. Appellate defense counsel, however, maintains that inasmuch as the revision proceedings were subsequent to, instead of before, sentence, they cannot be considered as satisfying Article 19. Considering Article 19 by itself, the argument has some plausibility; but practically and legally, it has no real merit.

Proceedings in revision are authorized by Article 62, Uniform Code of Military Justice, 50 USC § 649. The pertinent portion of that Article is as follows:

"(b) Where there is an apparent error or omission in the record or where the record shows improper or inconsistent action by a court-martial with respect to a finding or sentence which can be rectified without material prejudice to the substantial rights of the accused, the convening authority may return the record to the court for appropriate action."

Plainly these provisions authorize revision proceedings in order to make the record correspond to what actually took place at the trial. The same authority, although less direct, appears in the Manual for Courts-Martial, United

States, 1951. Thus, the general statement on revision proceedings is as follows:

"80. REVISION.—*a.* General.—The procedure of a general or special court-martial when reconvened for the purpose of revising its action or correcting its record will in general be as indicated by the form of record of proceedings in revision (app. 8*c*). See Article 62 for matters that cannot be reconsidered and 67*f* as to procedure in reconsideration of action on motions and similar matters. A certificate of correction may be used to make the record show the true proceedings. In this connection, see 86*c* (Correction of Record.)"

Manifestly, if the informal Certificate of Correction may properly be used in instances where the only object is to reflect what actually transpired at the trial, use of the formal revision procedure for a like purpose is also proper. In such an instance, no action affecting the sentence need be taken by the court. But, according to the contention of appellate defense counsel, the court would again have to vote on the sentence in order to comply with the Article 19 provision that no bad-conduct discharge be adjudged until the record is complete. However, a second consideration of the sentence under such circumstances would be an empty and useless gesture.

If we read Article 19 with Article 62, we can give effect to both without any ritualistic compliance with unnecessary procedure. The natural and commonsense meaning of both Articles is clear: The record of trial is to be considered with the record of proceedings in revision under Article 62 in order to determine whether the whole record is complete within the requirements of Article 19. When both of the records here are read together, there is no doubt of completeness.

True, the revision record does not purport to supply exactly what was said in the discussions but only "substantially" what was said. Considering the time interval between the two proceedings, more than substantiality can hardly be expected. But the accuracy of the

court's recollection is not questioned. Cf. United States v. Vaughn, 3 USCMA 121, 11 CMR 121. Moreover, it is apparent that if there are any omissions they are unimportant. A reading of the transcript of the original record alone suggests the probable nature of each discussion. But, by adding the record of the revision proceedings, the substance and sense of both discussions is obvious. This meets the general test of completeness laid down in United States v. Nelson, supra. Accordingly, we find no ground for reversal in the claim of incompleteness of the record of trial.

The other claim of error is that the presence at the trial of the legal officer for the convening authority prejudiced the accused. This claim has two aspects: (1) that the officer's mere presence was a manifestation of command control and calls for the application of the doctrine of general prejudice; and (2) that specific prejudice exists in the improper advice that the legal officer gave to the president of the court regarding Prosecution Exhibits 2 and 3.

No provision of the Uniform Code of Military Justice or the Manual for Courts-Martial prohibits the legal officer of the command from attending a court-martial trial as a spectator. Notwithstanding this absence of prohibition, appellate defense counsel suggests that since the legal officer is the legal representative of the convening authority his mere presence represents a form of command control. This position is directly contrary to that of defense counsel at the trial who specifically stated that he did not believe that the presence of the legal officer would prejudice the accused "in any fashion." However, because of the nature of the claim, we ignore this conflict of view and determine the issue on its merits.

In United States v. Gordon, 1 USCMA 255, 2 CMR 161, we set out the general rule by which we would judge the merits of a claim of command control. We there said (page 260):

". . . Obviously, we do not know his personal feelings toward the ac-

cused, but we are required to determine whether, under the particular facts and circumstances with which we are dealing, a reasonable person would impute to him a personal feeling or interest in the outcome of the litigation."

Tested by this standard of reasonableness, the claim here falls far short of any imputation of personal feeling.

If it were shown that the presence of a legal officer at a court-martial trial was part of a plan of influence, we would not hestitate to reverse. However, in the absence of any such showing, the legal officer's presence alone does not imply any personal interest of his own or of the convening authority in the outcome of the trial. On the contrary, there are any number of proper and practical reasons why the legal officer of a command should attend the hearing of a case. The efficient operation of the courts-martial system requires careful and informed supervision of its actual operations. Who can better evaluate the practical functioning of the courts-martial of a command than its own legal officer? Of course, the legal officer may choose to confine his efforts to an examination of the records of trial; but neither law nor reason requires that he circumscribe the scope of his supervision. Moreover, a firsthand study of the way in which trial and defense counsel conduct themselves before the court-martial is of immeasurable value in the appraisal of their capabilities as counsel. Consequently, we conclude that in the absence of a preconceived plan of influence, no error is committed when the legal officer of a command attends a court-martial trial as a spectator.

Presence as a spectator is one thing; participation in the proceedings, other than as a witness, is an-other. When the legal officer's presence developed into participation as advisor to the president, he became an interloper. This was patent error. United States v. Guest, 3 USCMA 147, 11 CMR 147. Appellant maintains that in the incidents of advice, the president surrendered his functions as presiding officer

**574**

to the legal officer. Such surrender, he contends, falls within the condemnation of general prejudice. Ignoring the fact that the ultimate rulings were actually made by the president, the two discussions were isolated incidents in a trial which was otherwise marked by a commendable adherence to proper procedure. As such isolated incidents, they fall within the permissible range of procedural deviation which we recognized in United States v. Berry, 1 USCMA 235, 2 CMR 141. In that case referring to the failure of a law officer to perform his duties at the trial, we said:

"We recognize, of course, that, on occasion through inadvertence or momentary indecision, a law member or law officer may fail to rule promptly on an issue before him. We have observed instances of this sort in which the president has stepped into the breach and acted. Isolated and minor examples of this nature do not concern us greatly."

Consequently, general prejudice cannot be invoked in appraising the error.

Turning to specific prejudice, we find no fair risk of harm to the accused in either of the two discussions. The second of the two was clearly beneficial to the accused. As a result of it, the president reversed his previous ruling and permitted the defense to introduce evidence on the claim of illegality of the search.

As to the discussion which resulted in the admission of Prosecution Exhibits 2 and 3, we note that defense counsel, a qualified member of a State bar and certified by The Judge Advocate General of the Navy in accordance with Article 27, supra, expressly stated that he had no objection to the admission of the exhibits. This alone would be sufficient to preclude any assertion of error on appeal. United States v. Dupree, 1 USCMA 665, 5 CMR 93. However, even assuming that the objection was preserved for appellate review and that the admission was erroneous, the exhibits were entirely cumulative. The witness had already testified that the guns

were his own; he identified them by model and manufacture. Furthermore, the accused removed any question of ownership and identity of property from the case when he admitted, in his own testimony, that he took them from the witness' suitcase. United States v. Isbell, 1 USCMA 131, 2 CMR 37. Here again, no possibility of prejudice exists.

Although we have found no prejudice in the discussions between the legal officer of the command and ▮ the court, we do not condone such conduct. On the contrary, we strongly condemn such practices. The legal officer of a command should not take part in the discussion on any matter affecting the proceedings of a court-martial during the hearing of a case; United States v. Guest, supra. We appreciate his natural impulse to provide a court with the benefit of his training and experience, but the proper place for such instruction is outside the courtroom and at a time and under circumstances which completely exclude any possible imputation of improper influence. See United States v. Littrice, 3 USCMA 487, 13 CMR 43; United States v. Borner, 3 USCMA 313, 12 CMR 69.

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring):

I concur. I am convinced that we must measure the misconduct here— and it can be regarded in no other light—by the yardstick of specific prejudice. When we do this, we must conclude—as the majority opinion has demonstrated—that Self, as the accused in this case, could not have been harmed materially.

There is no question in my mind about the presence of positive error in this case. Behavior of the sort with which we are presently concerned certainly does not conduce to the dignified and orderly trial procedure contemplated by the Uniform Code. It is even possible that it would be regarded as shocking by civilian professional thinking. However, it must be noted that the presence of the staff legal officer in the courtroom at the time in question was prompted by no sort of improper purpose, and that defense counsel expressly had denied objection thereto. It is further to be observed that participation by the former was not volunteered, but rather took place following a clear invitation from the president. Finally —and despite arguments based on undesirability in some particulars—I am aware of no provision of either the Code or the Manual which prohibits broadly the presence of a staff legal officer or a staff judge advocate as an auditor during a trial by court-martial.

It is true that the courtroom presence of such an official should be scrutinized closely to assure that the members of the special court are in no way intimidated thereby—or feel that not only *may* they solicit his legal advice, but that they *must* do so. In this latter event, there would seem to me to be danger that the legal officer would have improperly usurped the role of the president in ruling on interlocutory questions—and perhaps the functions of all court members in other particulars.

In the last analysis, however, the impropriety which is here before us appears to constitute rather an instance of procedural irregularity than one of generally and inherently prejudicial misconduct. At the same time, I must regard it as a misstep which clearly reaches the level of error, although I am convinced that—after branding it as such—we are quite safe in leaving the protection of accused persons in this area to the mercies of the concept of specific prejudice and other similar prophylactic devices. This seems particularly true of a situation where the colloquy is distinctly on the record, with full opportunity available to defense counsel to hear and to object to the legal advice supplied. United States v. Soucy, 73 BR 25; United States v. Seery, 24 BR 65. That the legal officer's advice was not furnished pursuant to a sworn duty does not compel reversal in my view. United States v. Morin and Tallman, 75 BR 17.

Finally, it is not inappropriate to observe that the draftsmen of the Manual were alert to envision that in a trial by

special court-martial—and in light of the frequent, if not usual, lay composition of such a tribunal—legal issues may arise which are insoluble by the tribunal without external aid. In such an event, its members may, through the trial counsel, obtain opposite legal information from the convening authority. Manual for Courts-Martial, United States, 1951, paragraphs 44f(4), 73a, 74e. Under normal circumstances, and of course, this information will stem from the command's staff legal officer or staff judge advocate. These factors seem to present a further sound reason for considering the instant problem through the spectacles of specific prejudice.

LATIMER, Judge (concurring in the result):

I concur in the result.

It is admitted by my associates that the Code does not forbid the procedure followed here. As a matter of fact the Manual authorizes the president of a special court to secure help on legal principles from the convening authority. In this instance the president could have ordered a recess and then have discussed the procedural questions with the selfsame officer in the seclusion of his office. Instead of following that course, he used a more forthright and expeditious method. The staff officer was in the courtroom for a proper purpose and there is not the slightest suggestion that he desired to influence the outcome of the litigation. Such being the case, I fail to see why an answer to a question in open court, in the presence of accused and his counsel, is considered error, when if the same answer was given in a private conference, it would be proper. A president of a special court must, when confronted with technical legal problems, receive assistance from members of the service who have had legal training. That he seeks this information and receives an answer in the spotlight of the courtroom and in the presence of accused and his counsel, where the nature and extent of any discussions can be measured and spread on the record, is better than to require him to operate outside the courtroom. I would think that the potentialities for harm to an accused would be greater in the latter situation than in the former. Accordingly, under the facts of this case I would find no error.