UNITED STATES, Appellee

v.

JOHN J. GUEST, Private E–2, U. S. Army, Appellant

3 USCMA 147, 11 CMR 147

Decided July 31, 1953

John R. Riordon, Esq., and LT COL James C. Hamilton, U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, LT COL William R. Ward, U. S. Army, 1ST LT Donald M. Sukloff, U. S. Army, and 1ST LT Robert A. Forman, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Accused was charged with murder, robbery and absence without leave, in violation of Articles 118, 122, and 86, Uniform Code of Military Justice, 50 U.S.C. §§ 712, 716, and 680. He was acquitted of the charge of murder, and found guilty of the lesser included offense of larceny under the robbery charge and guilty of the absence without leave. He was sentenced to a dishonorable discharge, total forfeitures, and confinement for twenty years. Army reviewing authorities upheld the findings and sentence. We granted the accused's petition for review to determine whether the conduct of the president of the court-martial was prejudicial to the rights of the accused, and whether the law officer should have given an instruction on larceny under the robbery charge.

### I

The chief prosecution witness was Private Ernest L. Gephart, who was tried separately for the same offenses and found guilty by the court-martial. His story was as follows: He became acquainted with the accused during the month of October 1951. The two were in an absence without leave status and had lived in separate houses in Boo Pyong, Korea. On October 30, 1951, he and the accused went to Yong Dong Po where during the course of the day they had attended a Korean wedding. Prior to and during the time they were at the wedding, the two had engaged in excessive drinking of intoxicating liquor. After they left the wedding they purchased some additional whiskey at a liquor store and then decided to hitchhike a ride to Inchon. They were offered a ride in a one-quarter ton truck (jeep) by one Corporal James A. Carrington. Gephart rode in the back seat of the vehicle and the accused was riding in the front seat opposite the driver. After driving about one and one-half miles toward Inchon, the truck was stopped and Gephart, without any known or disclosed reason, shot the driver. After the shooting, he carried the body and deposited it in a ditch running along the side of the road. He was so frightened by his acts that he does not recall whether or not the accused assisted him in removing the corpse. He was positive, however, he and accused had not discussed the possibility of committing any offense and that he (accused) did not know Gephart was going to shoot the driver as the latter himself had no preconceived plans to do so. Gephart then drove the jeep to Boo Pyong where he took off his bloody clothes and attempted to wash the blood from the vehicle. He proceeded to the black market area in Boo Pyong where he contacted a Korean by the name of Pak whom he believed would dispose of the jeep through black market contacts. Because of the drunken condition of the accused it was necessary that Gephart and Pak help him into a Korean house where he was put to bed. On the following morning,

Gephart went to the home of the Korean, Pak, to collect the money and the accused was there present. While the three were together, a Korean boy arrived with 1,300,000 won to be paid to Gephart for the vehicle. The money was not passed because the Korean boy reported the military police had recovered the jeep. The transaction for the sale of the jeep to Pak was handled entirely by Gephart. The idea to sell was conceived by him when he was changing clothes and he testified that the accused was not familiar with any of the details. He further testified that he and the accused had no agreement to share the proceeds of the sale but that he might have given the accused some of the money had payment been made.

The accused made a pretrial statement which was admitted into evidence. In substance it shows that accused was in the company of Gephart and that they hailed a ride to Inchon in a one-quarter ton truck. He had consumed one bottle of whiskey and they had acquired a second bottle which they had with them. He offered the driver a drink which was accepted. Later while taking another drink, he heard a weapon fire and he then remembers Gephart asking him to help remove the body. He, however, refused to assist. After Gephart disposed of the body, he took the driver's seat in the vehicle and the accused passed out. Accused was awakened the next morning in a Korean house in Yong Dong Po. His only information on the transaction for the sale of the vehicle was that Gephart told him he was going to sell the jeep.

At the close of the testimony by the prosecution, defense counsel made a motion for a finding of not guilty on the charges of murder and robbery on the grounds there was insufficient evidence to establish that accused had committed either offense. The court then recessed and trial and defense counsel argued the motion out of the presence of members of the court-martial. Upon reopening the court, the law officer stated he had granted the motion for the finding of not guilty subject to objection by any member. Trial counsel then asked that the arguments be repeated before the court, which was done. At the conclusion of the arguments, the president of the court objected to the ruling by the law officer, and stated, "I would like to have the trial counsel obtain a copy of Board of Review Number 6, 1951." When trial counsel returned with the requested volume the president continued:

"Now I would like you to read to the court the case that is cited there in for the information of the court. The case that I referred to has its beginning on page 119, and specifically to the case of Private Duane G. Brutout and a Private James L. Meehan; and, I believe that it is continued on page 139."

Trial counsel did as requested and, in so doing, he elected to read from the dissenting opinion in the case. Defense counsel in presenting his side read the majority decision. When the court-martial members retired to consider the ruling, they voted to overrule the law officer. Defense counsel then asked permission to examine the president for a possible challenge for cause and the following information was elicited. Lieutenant Colonel Sitnek, Acting Staff Judge Advocate for the Division, had been present during part of the trial. While counsel were presenting their arguments to the law officer and the members of the court were not occupied, he furnished the president of the court with a certain volume of board of review decisions. It was open at the page where the particular decision, which the president of the court had trial counsel read, was reported. The president of the court during this recess discussed generally with Colonel Sitnek the principles of law involved and this must have included the rationale of the selected opinion. The decision, which was so conveniently shown to the president of the court, was one in which Colonel Sitnek participated when he was a member of the board of review. He had written a dissenting opinion holding there was sufficient evidence in that case to convict certain accused of either the offenses charged or offenses necessarily included therein. The only

149

fact savoring of good faith was the fact that the judicial council followed the reasoning of the dissent and it became the law of the case. However, neither counsel for the Government nor the accused called this fact to the attention of members of the court and if they learned of it their knowledge was not acquired through acceptable channels.

While we dismiss this cause because of the insufficiency of the evidence, we believe it highly desirable to speak out against the conduct of the president of the court and acting staff judge advocate of the division. It should not be necessary to call attention to Article 37 of the Uniform Code of Military Justice, 50 USC § 612, but their conduct invites refreshing their memory. The Article provides:

". . . No person subject to this code shall attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence, in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts."

While we do not specifically say that the staff judge advocate violated that particular article, his conduct certainly was not such as to bring credit upon his administration of military justice. He was the officer who reviewed the case for the convening authority and recommended trial by general court-martial. He expanded his legal theories in a written memorandum to the convening authority and suggested that if the court-martial believed certain evidence it might find accused Guest not guilty of murder and robbery but guilty of the lesser included offense of larceny. It is quite a coincidence that this is the precise verdict returned by the court-martial. Colonel Sitnek was present at the trial during part of the time and while the motion to dismiss was being argued before the law officer, and the court members were free to roam, he very conveniently furnished a volume of board of review decisions to the president of the court with

it open to the desired page. By so doing he thrust himself into the deliberations of the court-martial which involved issues of law and fact. Again it must have been a coincidence that the particular page where Colonel Sitnek's dissent commenced was mentioned by the president of the court and the findings returned can only be reconciled on a theory comparable to that in the dissent. We, of course, know of no reason why a dissent should be of such importance when a higher reviewing agency has reported an opinion in the same case, but this one seemed of particular importance to the president of the court. It is entirely possible that fervor and zeal for law enforcement prompted the ill-advised consultation, but lurking in the background is the possibility of reverting to the old concept that command must control and those charged with offenses must be convicted. We hesitate to ascribe improper motives to the acting staff judge advocate, but we are genuinely concerned about his efforts to get legal precedents before the court in an unauthorized manner. He is directed not to influence any action of the court-martial and when fairly read, the record suggests he may have violated that proscription.

The president of the court is likewise subject to criticism for his conduct. The accused is entitled to a fair and impartial trial by a court uninfluenced from outside sources. Every officer serving on a court should know that it is not in keeping with the spirit of the Uniform Code of Military Justice for a member of a court-martial to discuss with unauthorized persons a case which is pending and which he must decide. His sources of information are those which are recognized as part of the military judicial system and his decisions should be predicated upon information obtained in the courtroom. We hope the caveat herein expressed will have the desired effect and that courts-martial will in the future be unmolested by self-appointed friends of the court.

In granting this petition for review we did not include, as one of the

grounds, insufficiency of the evidence to sustain the finding. We did, however, permit the accused to present and argue the inadequacy of the instructions. We have concluded to bottom our decision on the first ground even though we have not afforded the Government full opportunity to present arguments on that issue. However, were we to hold there was sufficient evidence, we would be required to reverse for inadequacy in instructions on the theory stated in United States v. Sylvester Clark (No. 190), 1 USCMA 201, 2 CMR 107, decided February 29, 1952, and companion cases. Therefore, the only difference, in so far as the Government is concerned, is that we order a dismissal instead of a rehearing. In the end, this may save considerable time and expense because if the evidence in a subsequent trial was the same as reflected in this record, we would have to dismiss that conviction.

If there is any theory on which the accused in this case might be convicted, it would be only upon the theory that he aided and abetted Gephart in the commission of the offenses. In discussing that problem we stated in United States v. Jacobs (No. 152), 1 USCMA 209, 2 CMR 115, decided March 13, 1952:

"Inactive presence during the commission of an offense is clearly an insufficient link to guilt. The aider and abettor must share the criminal intent or purpose of the active perpetrator of the crime, and must by his presence aid, encourage, or incite the major actor to commit it. . . . The proof must show the the aider or abettor did in some sort associate himself with the venture, that he participated in it as in something he wished to bring about, that he sought by his action to make it successful. . . . The standard of relationship of the offense by which conviction as an aider and abettor must be measured, therefore, lies somewhat between proof of participation as a paramount agent, on the one hand, and speculative inference based on mere presence at the scene of the crime, on the other, and is made definite by the requirement of evidence of specific intent."

Quite clearly the evidence presented in this case shows only mere presence at the scene of the crime, which is insufficient. Because the accused was found not guilty of murder, and, the larceny finding grew out of the robbery specification, we limited our discussion to the evidence bearing on the latter.

Gephart, the perpetrator in the crimes, testified that at no time did the accused aid or encourage him in the commission of robbery. In fact, he stated that he did not plan either the murder or the robbery until just before he killed the victim. Accused could not have assisted in planning them beforehand if the previous statement was true, and there is no contrary evidence. Of course, it can be suspected that accused played some part in the violent death and robbery of the victim by counseling or advising Gephart but the suspicions have no basis in fact. So far as we are able to ascertain, there is no evidence which in anyway suggests the accused participated in the crimes of murder and robbery and this conclusion is fortified by the findings of not guilty returned by the court-martial. If, therefore, the accused was guilty of larceny it was because of his participation in the events on the day following the murder.

An analysis of the evidence discloses no support for the finding that accused was guilty of larceny. He did not encourage Gephart in the theft of the jeep and he did not participate in the arrangement for or encourage its sale. Disposition of the proceeds of the sale were at no time discussed between the two. The only incriminating circumstances which involve the accused are that he was in the vehicle when the two crimes were committed and he was sitting at the table with Gephart and Pak, the Korean blackmarketeer, when they were discussing payment for the sale of the jeep after the deal had been consummated. It may be, as contended for by trial counsel, that it is difficult to get friends to convict each other, but that argument is no valid substitute for facts. The record shows without dis-

**151**

pute that accused was drunk prior to the murder, robbery and negotiations for sale and that he remained that way until the next morning. His pretrial statement shows recollection of only the most vivid incident—that of a shot. He was carried in and put to bed because of his intoxicated condition. It is true the court-martial members might disregard that evidence, but there is nothing to support the finding if they did. The first two offenses were perpetrated almost simultaneously and it is not unreasonable to believe the story told by Gephart that he shot without provocation or incident and without having discussed the matter with the accused. We must also believe that Gephart did not disclose to accused his negotiations for sale of the jeep. These were carried on with a Korean blackmarketeer known to Gephart and in the absence, either physical or mental, of the accused. When the discussions continued the next day, they concerned themselves with details of payment and in so far as accused was concerned he was not to participate. The only knowledge he could have gained at that time was that the jeep had been sold to or through Pak and that the parties were awaiting payment of the money. We are at a loss to determine how, or in what way, that would be aiding in the theft of the property. Knowledge that an offense has been committed does not make one guilty of that offense. In that connection we must make clear that the accused was not charged with the sale of Government property or with being an accessory after the fact. His conviction here must stand or fall on the charge of larceny. When the evidence disclosed by this record is tested to determine whether the accused can be found guilty, it fails because we cannot find any testimony which shows any aiding, abetting, counselling, commanding, or procuring of a theft on the part of the accused. The web of circumstances is too incomplete to support the finding.

There is no contention that the offense of absence without leave is not established by the evidence, and that finding is not attacked on appeal. It is, therefore, affirmed. The conviction of larceny is dismissed and the record of trial is returned to The Judge Advocate General of the Army for reference to a board of review for reconsideration of the sentence.

Judge BROSMAN concurs.

Chief Judge QUINN concurs in the result.