UNITED STATES, Appellee

v

JOHN C. MOTEN, Private E–2, U. S. Army, Appellant

6 USCMA 359, 20 CMR 75

360

No. 6512

Decided September 16, 1955.

*Captain Frank C. Stetson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Joseph L. Chalk.*

*Captain Vernon M. Culpepper* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant A. Kenneth Pye.*

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused in this case was tried by general court-martial and found guilty under a charge that he had wrongfully appropriated a .45 caliber pistol, in violation of the Uniform Code of Military Justice, Article 121, 50 USC § 715. The findings and sentence were approved by the convening authority, and later affirmed by a board of review in the office of The Judge Advocate General, United States Army. Our grant of the accused's petition for review was limited to two issues, one of which has been disposed of in a manner adverse to his position by our decision in United States v Petroff-Tachomakoff, 5 USCMA 824, 19 CMR 120. The remaining question has to do with legal sufficiency, and to this we now turn our ·attention.

II

At about six o'clock in the morning of June 26, 1954, a soldier named Connor, who was assigned as a military policeman at Camp Stewart, Georgia, was issued a .45 caliber pistol from the arms room maintained by the Military Police Detachment at the post stockade. According to Connor—who testified as a Government witness—he returned the weapon approximately one hour later to the Detachment's orderly room, which was located near the arms room. Although he could not identify the person to whom he had delivered the weapon, he stated that the recipient had not been a "stranger" and so could not have been the accused, with whom Connor was not acquainted, and who was not a military policeman.

**361**

The stipulated testimony of one Stepanski indicated that he had been responsible for the arms room during the early morning hours of June 26th, that he had issued a .45 caliber pistol to Connor, and had charged the weapon to him on that date, but had not receipted for its return at any later time. During normal off-duty hours in the latter part of June, Stepanski had been assigned to the arms room. In performing his duties there, he had seen to it that the room was locked, and that the key thereto was safely on his person whenever he left the premises. The pistols themselves were kept in a locked rack. Pistols of .45 caliber were issued to military policemen only, and Stepanski had observed nothing which suggested that an intruder might have obtained access to a pistol on or about June 29, 1954, by "tampering around the arms room."

A Corporal Estacio, the regular arms room attendant at the stockade, had discovered at approximately 3:00 p.m. on June 29th that one of the .45 caliber pistols entrusted to his care had disappeared. A check of the remaining weapons, and of the room's charge roster, revealed that the missing firearm was that charged against Private Connor on June 26, 1954.[1] According to this "sign-out roster," which was maintained as part of the standing procedures of the arms room, the weapon had never been returned by Connor. Estacio, also, related that the arms room contained a window measuring approximately 14 inches by 14 inches, through which weapons were issued, and a door which locked automatically when closed. The door was customarily kept in this position. Moreover, the facility's stock of pistols was stored in a locked rack which was located some seven feet from the mentioned window. Estacio believed that he had counted all weapons on June 28th and that all had been present. However, he was not questioned as to whether he had assumed on the 28th—if he did in fact, as he believed, accomplish an inventory at that time—that one of the weapons still remained in Connor's possession. Indeed, the Government presented no sort of suggestion of means by which the pistol could have been returned to its rack on June 26, yet have been carried thereafter on the roster as being in Connor's possession.

On June 29 the accused, Moten, was detailed as a prison guard at the stockade and, as such, would under normal practice have been issued a 12-guage shotgun. The accused's post was "approximately 50 to 75 feet" distant from the military police orderly room—but there was no testimony indicating that he had entered that room at any time on the day in question. Since he was not a member of the Military Police Detachment, there was no reason to suppose that he had been in the vicinity of the orderly room or the arms room at any time prior to June 29th, when he began his duties as a guard. Certainly he had not been seen there.

Various Government witnesses testified that Moten had been seen during August 1954 in possession of a pistol of some description. On one such occasion he was present in the Blue Moon Cafe, a popular resort in a nearby town, and had been observed to be carrying a weapon tucked inside his trousers, only

---

[1] It has been argued that it is not open to us to consider information reflected in this arms room ■■■■■■ ■ charge roster. It may be said without more that this information would appear to be admissible in evidence as a business entry—even if it were not shown to meet the requirements for acceptance as an official record. Manual for Courts-Martial, United States, 1951, paragraph 144c. Significantly, neither party interposed any sort of objection at the trial to the consideration of data contained in the roster.

It makes nonsense, of course, to suggest that the location of this accounting document on the wall of the arms room has anything to do with whether it constituted a "part of the standing procedures" of the facility. One at all familiar with military administrative operations in the field must know that many records of an undeniably high degree of officiality are often maintained under conditions of even greater informality and at least equal publicity.

a portion of which was visible. A military police corporal named Wingfield testified that he "couldn't very well state whether it was a 45 Caliber pistol or not, they do have some 30's made up on a 45 frame, and they have a 32 made upon a 45 frame. But the hammer of it was a 45." Other identifications of the accused's firearm were very much less positive.

Government evidence also established that, on several occasions during the summer of 1954, the accused had been in possession of another small arm denominated a "blank pistol." Testimony from various witnesses indicates that this was, in fact, Prosecution Exhibit 3 for Identification, which was described by the court reporter as "a blank revolver . . . [of] .32 caliber . . . and was fairly well worn." Like the court-martial, however, we are not permitted to consider this exhibit for any purpose, since it was at no time received in evidence. The accused's "blank pistol" had been "signed in" to a private Molina, still another Government witness, who was the artificer of the accused's engineer company. One reply by Molina indicates that it was delivered to him by the accused on August 1st, but answers to other questions from both trial and defense counsel leave no doubt that the delivery date had been August 30.

The Government introduced the stipulated testimony of a Sergeant Walker, of the Criminal Investigation Detachment, who stated that on August 23, 1954, he had interrogated Moten concerning a .45 caliber pistol said to be missing from the post stockade, and had informed the accused that he had been seen during August with a pistol of some sort in his belt at the Blue Moon Cafe. The accused had protested that this firearm had been "a blank pistol"—but he did concede that he believed he could locate the .45, and that he would attempt to secure it for Walker. Three days later the investigator talked with the accused by telephone and thereafter revisited him, at which time the long-absent pistol was handed to him.

In response to the Government's case, the accused took the stand and testified that, when interviewed by Walker, he had falsely told him that he believed he knew the possessor of the pistol for the reason that he thought he could somehow arrange for its surrender. He said:

". . . I figured it was like this: If the .45 was stolen, which I knew it was, if a friend of mine had took it, or anybody I knew had took it, I felt that I could get it back because if it was any kind of friend of mine he wouldn't want to see my future get jeapordized [sic] so I told Sergeant Walker that I thought I could get the .45 and during the process of my looking I spread the word around Hinesville and various other places that I went to, that if anybody knew anybody with a .45 to, please, get in touch with me and give it to me so I could turn it in to the CID and I told them that I knew who had it, which I didn't, but I said that I was going to tell the CID and the CID would get them. But anyhow, about four or five nights later I was on a pass and it was about four or five o'clock in the morning and the .45 was under the dustcover on my bed when I started to bed and I turned it over to Sergeant Walker the next morning."

The defense thereafter called a witness who corroborated Moten's story to the effect that he had announced to various persons that he wished the possessor of the missing weapon to surrender it to him that he might return it to the investigator.

III

There have been previous occasions on which we have been required to sustain defense contentions that evidence submitted to show larceny was insufficient. See e.g., United States v Duffy, 3 USCMA 20, 11 CMR 20; United States v Guest, 3 USCMA 147, 11 CMR 147; United States v Brown, 3 USCMA 242, 11 CMR 242. The facts of the Duffy case bear special relevance to the present situation. There the accused and two unidentified Ko-

rean Nationals had been present in an unattended military "tire shop." Shortly thereafter two tires were found to be missing. When he returned to the area the accused was questioned—but his subsequent confession was not available for use at the trial because of a failure to comply with the provisions of Article 31. Later—but within an hour of the time the theft was reported—the accused, accompanied by law enforcement agents, went to a Korean house in a nearby town and retrieved the two tires. This Court ruled that:

"There is no doubt that the evidence recited above directs the finger of suspicion at the accused. Mere suspicion, however, is not a foundation sufficient for the support of a criminal conviction. There are fatal gaps in the evidence relied on by the prosecution in this case. When were the tires taken? Were they taken while the accused was in the shop? Did not the two Koreans have as great an opportunity—and perhaps a more compelling motive— to take the property? What and who were the moving forces behind the trip to the Korean house? Who dwelt in the house? With the presumption of innocence ever weighing in favor of an accused person, 'suspicion, conjecture, and speculation cannot form the basis for fact-finding action.' United States v Peterson (No. 199), 1 USCMA 317, 3 CMR 51, decided April 17, 1952. A conclusion of this accused's guilt on the evidence introduced against him can only have been the result of naked speculation and conjecture. The resulting conviction must, therefore, be set aside for insufficient evidence and the charges must be dismissed." [United States v Duffy, 3 USCMA 20, 22, 11 CMR 20.]

Particularly apposite are the comments of Judge Latimer:

"I concur in that portion of the opinion which holds the evidence is insufficient to support the findings of guilt. The Government seeks to sustain them by relying on the rule stated in the Manual to the effect that proof of possession of recently stolen property, not satisfactorily explained, raises a presumption that the possessor stole it. I do not question the rule but there is no evidence to justify its application. Possession as contemplated in that doctrine is something more than knowledge of where the property is secreted. The record shows that the accused went to the place where the tires were located but this does not complete the chain of circumstances. Without some evidence as to who owned, controlled or had the right to occupy the particular premises involved, it is impossible to determine who actually was in possession of the stolen property. When the foundation for the presumption crumbles both fall. Furthermore, as stated in the Court's opinion, there are no other facts and circumstances from which it can be inferred reasonably that the accused was the offender." [United States v Duffy, supra.]

We shall now seek to point out some of the "fatal gaps in the evidence relied on by the prosecution in" the present Moten case. First, we observe that the investigators failed to discover the pistol in question within the accused's possession at any time before he delivered it to them voluntarily. Yet presumably —and this inference is fortified by a passage in the record—a search was made among the accused's belongings. There was testimony that during the month of August the accused had been seen with an undescribed pistol. However, that Moten was at any time in possession of a weapon of .45 caliber is left shrouded in doubt by the testimony—and it is indisputable that he possessed a pistol of a wholly different character during the same period.

Of course, "proof that a person was in possession of recently stolen property or a part of it raises a presumption that he stole it." Manual for Courts-Martial, United States, 1951, paragraph 138a. However, this presumption is not to be accepted uncritically in the review of a record of trial by court-

martial. Cf. United States v Duffy, supra; United States v Adaszak [ACM S–7277], 13 CMR 640; United States v Allen [CM 359997], 9 CMR 318. Here, for example, the weight of the inference is distinctly diminished by the lapse of almost two months between the weapon's disappearance and its return—a circumstance which bears on how "recently" the weapon must have been stolen. Most important, the return of the property by Moten might well—under the circumstances of this case—have reflected little more than a "knowledge of where property is secreted." Previous control over the weapon by Moten was simply not shown by the Government—and this seems to us a significant omission.

The accused—it will be recalled—informed military investigators that he knew where the weapon was to be found, but he also expressly denied that he had stolen it. It would be inappropriate now arbitrarily to tear the exculpatory portion of his statement out of context—that is, from that part which tended to incriminate him. Cf. United States v Johnson, 3 USCMA 209, 11 CMR 209; United States v Northrup, 17 CMR 850. Moreover, the return of the property by the accused—an act which of itself constituted an admission on his part—should also be weighed against the exculpatory portions of his pretrial statement and all of his trial testimony. United States v Northrup, supra.

In all probability, however, these defects would not require a holding of insufficiency, save for one especially serious flaw in the case—which appeared, incidentally, in the Government's own evidence. In the early morning of June 26, the very weapon which is the subject of the present charge, and which was discovered to be missing three days later, was charged against Private Connor. Thus, two possibilities consistent with the accused's innocence are arguable. One is that Connor did not return the weapon as he testified he did. In that event, Connor would doubtless have been guilty of the larceny of the weapon, and the accused's possession of that firearm during August 1954—if it existed in fact—would, at worst, result in the commission of an offense other than the one for which he was tried.

The alternative to this hypothesis is that Connor did as he said—that is, that he returned the weapon on June 26 to some recognized but unremembered person in his unit's orderly room. If the weapon had been surrendered to the arms room at that time, the roster of weapons would, under standard procedure, have reflected that event. Since uncontroverted Government evidence indicated that no entry in the roster recited the pistol's return, the presumption of regularity would certainly dictate the conclusion that the weapon had not been restored to the arms room. Cf. United States v Bennett, 4 USCMA 309, 15 CMR 309. If, nonetheless, we assume that the pistol did resume its place in the rack, together with 29 other similar firearms, then the mathematical probability that it was *this* .45 caliber pistol that the accused took—if, of course, he stole at all—would be in a ratio of 1 to 30.

Reasonable men, then, can only infer that the weapon issued to Connor on June 26, did not return to the arms room. The accused, a member of an entirely different unit, did not come upon the scene until three days later, at which time one witness placed him on a post some 50 to 75 feet from the orderly and arms rooms of the Military Police Detachment. That degree of physical proximity scarcely rises to the level of the opportunity to steal enjoyed by the accused in United States v Duffy, supra. Assuming, however, that the accused before us did possess an opportunity to steal a military police .45 pistol on June 29, what—one must ask—had been the history of the Connor weapon during the preceding three days?

Are we to suppose that it simply remained in the orderly room of the Military Police Detachment for that period, and that no one troubled to return it to the adjacent arms room? This is indeed an unreasonable hypothesis in

light of what one with any sort of military experience knows of the procedures utilized in the issuing and handling of weapons. Was the weapon carried in the course of their duties by other military police personnel for three days? In view of the usual practices followed in accounting for a unit's arms, this, too, would seem to involve serious irregularity. In the normal course of events, the weapon would have been returned to the arms room, logged in on the arms roster, and reissued.

Of course, the unit may have followed unorthodox procedures, and may have permitted the informal transfer of a weapon from person to person without the formality of being "signed in" at the arms room and redelivered to the succeeding user. Yet the record contains no slightest suggestion that an irregular practice of this sort was pursued in the organization in question—and it would be unjust to the accused to rely on its dubious existence in this review of his case for evidential sufficiency.

Reasonable men—we are sure—would concur in the hypothesis that the firearm had been the subject of larceny prior to June 29, 1954. Since the accused was not shown to have enjoyed an opportunity to steal it before that date —if indeed, he was shown to have possessed such an opportunity then— it is only logical to infer that the pistol was stolen by one other than himself. Moreover, it is unreasonable to suggest that he must have aided and abetted in the theft—since he was not a member of the Military Police Detachment, and would have been in no better position to aid and abet than personally to misappropriate the pistol.

Following the hypothesis that the weapon was stolen before June 29—and by another—we find several possible subsidiary hypotheses to account for its possession by the accused on August 26. One is that his account of innocence is wholly true—but, despite corroboration of this story in part, it would be rash to assert that *all* reasonable men would join in accepting it. Another explanation is that the accused simply knew the thief and hoped at the same time to clear himself and terminate the investigation by securing the weapon's return. Again he would be innocent of the offense charged. A third possibility is that Moten had been handed the stolen pistol by another at some time before his initial interview with Sergeant Walker, and that this was the firearm observed in his possession during August. In this event, he would be guilty not of the charged crime, but at most, of another. The fourth alternative is that the accused at some time had wrongfully taken the firearm from the original thief. Since stolen property may itself be the subject of theft, doubtless the accused would thus have been guilty of a violation of Article 121 of the Uniform Code. The difficulty here is that there is little reason to select this final hypothesis, which imputes guilt, in preference to its three fellows, which uphold innocence.

Reasonable men must agree that an hypothesis of the accused's innocence remains tenable *unless* it can be shown that the .45 caliber pistol in question was not stolen originally by one other than the accused. Yet, as we have sought to show, an analysis of the evidence reveals the contrary—namely, that in all probability the weapon was purloined on or about June 26. Under the Government's own evidence, then, reasonable men would agree that a rational hypothesis other than one of guilt may be drawn from the evidence. United States v O'Neal, 1 USCMA 138, 2 CMR 44.

It may be said that we are proposing to defy the effect of the presumption arising from the possession of recently stolen property. Yet that presumption can scarcely sustain findings of guilty when the evidence strongly indicates that the theft must have occurred at a time before the accused enjoyed the slightest opportunity to steal. And even less potent is the presumption when the circumstances of the August 26 "possession" of the property by the accused are entirely consistent with an explanation that he had innocently secured the weapon for the purpose of returning it, but had not taken it himself. Cf. United States v Duffy, supra.

Since the evidence is as a matter of law insufficient within this Court's standards to sustain the findings of guilty, it follows that they cannot be affirmed—and the charges themselves must be dismissed. It is so ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

This case is not Duffy (United States v Duffy, 3 USCMA 20, 11 CMR 20), nor Guest (United States v Guest, 3 USCMA 147, 11 CMR 147), nor Brown (United States v Brown, 3 USCMA 242, 11 CMR 242) simply because we are testing the sufficiency of the evidence and in that process a slight change in facts makes an ad hoc decision necessary. In this particular instance, I willingly concede that the author Judge makes a fine jury argument, but it should be made in the trial arena and not in this Court. I venture to suggest it almost duplicates defense counsel's summation of the inferences which could be drawn reasonably from the facts if the court-martial believed his client. Unfortunately for the accused, the court-martial found against him, and while my efforts will produce no precedent for future use, I set forth my reasons for concluding that the findings are supported adequately by the evidence.

At about 6:00 a.m., on June 26, 1954, Private First Class Billy G. Connor drew a caliber .45 pistol, M 1911, from the Military Police Detachment arms room at the Post Stockade, Camp Stewart, Georgia. Connor kept this weapon for about one hour and then, because his duties required it, exchanged the weapon for a shotgun. The exchange of weapons took place in the orderly room for no one happened to be in the arms room at that moment. Although Connor could not remember the particular person to whom he gave the pistol, he was sure that the person was not a "stranger," and the accused was a stranger to him. Moreover, I am reasonably certain he did not obtain a shotgun from an unauthorized and unknown person.

On June 29, 1954, the accused was detailed as a prisoner guard at the Camp Stewart stockade. He was probably armed with a 12-guage shotgun as that was the weapon issued to those who were detailed for that duty. He was present at the Main Gate when he was assigned to his detail, and this location was some 50 to 75 feet from the orderly room, which was near the arms room. By no means, however, does the record establish that the Main Gate was assigned to him as his post, carrying with it a conclusion that he was expected to remain there.

At about 3:00 p.m., on June 29, 1954, Corporal Estacio, the arms room attendant, discovered that a caliber .45 pistol was physically absent from the arms rack. There was nothing to indicate that any one had tampered with the entrance to the arms room. A subsequent check revealed that the missing weapon was the same one which had been drawn by Private First Class Connor three days earlier. Although the return of the weapon had not been recorded, Corporal Estacio physically counted his pistols daily, and to his knowledge all of the pistols were present on June 28, 1954. Furthermore, Connor testified he returned this weapon on June 26, 1954, and I assume the court-martial could believe both of those witnesses even though my associates spin out a hypothesis to the contrary. From what has been said to this point, I conclude that the court-martial could find reasonably that the weapon was in the arms rack on June 28, 1954, and that it turned up missing on June 29, 1954, at a time when the accused was physically present in the area. But more than that, everyone concedes the weapon was misappropriated on or about that time, and the only dispute is about the identity of the misappropriator.

On August 18, 1954, Corporal Wingfield saw the accused at a local cafe in Hinesville, Georgia. He was no more than six feet away, in a lighted room, and observed that the accused had a pistol of some sort shoved inside his belt. Wingfield normally carried a caliber .45 pistol in the course of his duties and thus had more than a passing acquaint-

anceship with that particular type of weapon. While the Corporal admitted that he had seen only the butt and hammer of the weapon and conceded that he knew of "some 30's" and "a 32" made upon the frame of a caliber .45 pistol, he testified that the weapon carried by the accused appeared to him to be an Army caliber .45 pistol. Two other Government witnesses testified that during the month of August 1954, they had seen the accused in possession of a pistol. While each had not seen it in its entirety, what they observed caused them to believe the weapon was an Army caliber .45 pistol. Both weapons were present in court and were seen by the witnesses and the court members. The witnesses pointed to the part of the weapon that was not obscured by the shirt of the accused, and the court members could visually notice the opportunity each had to make their respective identifications. Of course, the witnesses could not identify the weapon they observed on the person of the accused as the one produced at trial; but when their evidence is considered from its four corners, it would support a finding that the accused had possession of a caliber .45 pistol. In addition, any person familiar with weapons could distinguish a .45 caliber from a .32 and they would not need to see more than the butt and hammer of the former to be certain of their identification.

The next bit of evidence which is of some importance is found in the stipulated testimony of Sergeant Walker, of the Criminal Investigation Detachment. In my view, it is worthy of somewhat more extended consideration than the cavalier treatment given it by the majority. I quote from the stipulation:

"On 23 August 1954 I interviewed Pvt John C. Moten concerning a missing .45 cal. pistol. Prior to talking with him, I read Article 31, UCMJ, to him and told him I was investigating the disappearance of a pistol from the Post Stockade. I told him that he had been seen with a pistol in his belt at the Blue Moon Cafe in Hinesville. He told me that the pistol he had in his belt was a blank pistol but added, I suppose you are going to ask me

about the .45 pistol that was stolen from the stockade on 29 June. During the course of our discussion he said he knew where the pistol was and that he would get it for me."

It strikes me, and it could also have occurred to the court-martial members, that in this statement the accused volunteered too much information about the disappearance of the pistol and its then location. At trial he recanted on that portion of his admission which stated he knew where the weapon was, but reasonable men might accept his earlier statement and well believe that he knew where the pistol was because he had it secreted. The ways of mankind are such as to lead reasonable men to wonder why a person does nothing for a long period of time and then, when he comes under the eye of an investigator, suddenly takes it upon himself to be so helpful while proclaiming his innocence. See, for instance, the statement of facts in United States v Dykes, 5 USCMA 735, 19 CMR 31. After all, had the accused learned of the date of the loss from what he had heard around his unit, and if he knew where the gun was and that he could return it to military authority, why did he wait until the finger of suspicion was placed on him? Is it unreasonable to assume that he saw the web encircling him and that he joined the chase to avoid being caught in its meshes?

We come, then, to the evidence that on August 26, 1954, three days after his interrogation, the accused delivered the missing pistol to Sergeant Walker, and to another area of disagreement between myself and my associates. The majority seem to hold that one who is found to have the exclusive, personal possession of stolen or wrongfully appropriated propery some 51 days after it is taken (June 29—August 18, 1954), does not possess recently stolen property. I say "seem to hold" because it is seized upon as a defect in the Government's proof. But, contrary to my associates, I find this case is not United States v Duffy, supra, for here the evidence shows that from the time of the disappearance of the pistol to its return,

368

the accused was the only person who is known to have custody, control or possession of the weapon, either constructive or actual, and he admits possession, albeit for a short period. Furthermore, the lapse of time mentioned in the majority opinion is only important in that the triers of fact might be less inclined to believe the possessor was the thief if the time interval is lengthy.

The present Manual for Courts-Martial, United States, 1951, paragraph 138a, page 240, provides as follows:

"Proof that a person was in possession of recently stolen property or a part of it raises a presumption that he stole it, and, if it is shown that the property was stolen from a certain place at a certain time and under certain circumstances, that he stole it from such place at such time and under such circumstances."

That is the sort of presumption, inference, hypothesis, or whatever else it may be called, which will support a finding of theft or misappropriation unless countervailing evidence of innocent possession satisfies the court members that the possessor did not misappropriate the property. It is my understanding of the law that, within reasonable time limits, the question of whether property was recently stolen is a question of fact for the court-martial. It is true enough that the possibilities of an innocent explanation may be increased as time marches on, but to say that 51 days is so long a period of time that, as a matter of law, the property *could not possibly* be considered as recently stolen is contrary to the opinion of many well-recognized authorities.

In Wigmore, Evidence, 3d ed, § 152, I find the following:

"*Possession of Stolen Chattels.* On a charge of taking goods, the fact that A was found, subsequently to the taking, in possession of the goods taken is relevant to show that he was the taker. It is true that several other hypotheses are conceivable as explaining the fact of his possession; nevertheless the hypothesis that he was the taker is a sufficiently natural one to allow the fact of his posses-

sion to be considered as evidentiary. There has never been any question of this: [quoting cases]

"The inquiry is here as to the admissibility of the evidence, and only one or two questions capable of dispute have ever been suggested. The *time* of the subsequent possession is immaterial; the lapse of a long interval opens a greater possibility of innocent explanations, and may prevent the raising of a presumption of law, but does not alter the relevancy of the fact."

In State v Oliver, 355 Mo 173, 195 SW 2d 484 (1946), the court had occasion to consider the question of recentness, and said:

". . . What is meant by 'recent possession' must be determined from the facts in each case and may vary from a few days to many months. State v. Jenkins, Mo. Sup., 213 S. W. 796. Here the property was not discovered in defendant's possession for about three months after the burglary, but evidence offered in defendant's behalf shows that the property had been on defendant's farm with his knowledge for some time before it was discovered by the officers. Under the facts here the possession was 'recent,' and the jury was not required to believe the explanation offered on behalf of defendant. State v. Denison, 352 Mo. 572, 178 S. W. 2d 449, loc. cit. 454."

See also United States v Boyd [ACM S-3330], 7 CMR 710, where the accused was "seen" with the stolen property six weeks after the loss, and found in possession more than a year after the theft. In the light of those authorities, I would believe that the mere lapse of time is no more important to a proper finding by the court-martial than is the character of the goods stolen, their stability, their portability, and the question of whether the accused was found in possession of all, or only a part, of the stolen goods. State v Lyles, 211 SC 334, 45 SE2d 181 (1947).

Going one step further, the fact of possession of recently stolen property casts upon the accused the duty of pro-

**369**

ducing an explanation of his possession. Here he sought to do just that, and he testified that he did not misappropriate the pistol; that he inquired among his friends concerning its return; and that it was thereafter delivered to him by some one who left it under his pillow cover. He was corroborated to the extent that another witness testified he had heard the accused publicly announce that he was seeking the pistol. But were the court-martial members compelled to believe the accused, or could they reject the explanation and base guilt upon the other facts and circumstances? I have no hesitancy in proclaiming reasonable men could find the explanation a fabrication and that is precisely what this court did.

Three other matters bear answering. First, I am somewhat amazed by the statement in the Court's opinion that the first defect in the Government's case is that the investigators did not find the pistol at an earlier date, particularly when they had searched through the accused's personal effects. In answer to that astounding conclusion, I merely state that a pistol is small, it is portable, it can be hidden without difficulty, and it is not likely the accused would secrete it in a place where it would be discovered on the first showdown inspection. Of course, overlooked in my associates' argument is the conclusive testimony in the record that the weapon was not in his personal effects until some mysterious person placed it under the cover. Just why it is a defect in the Government's case because the searchers fail to find a weapon in one place when the evidence shows it was not there escapes me. Apparently, the better the loot is concealed the greater the gap in the Government's testimony.

Second, in order to reach a result that there is insufficient evidence in this record, the majority opinion argues that there are two possibilities of innocence flowing from the fact that the misappropriated pistol was charged out to Private First Class Connor. I quote: "One is that Connor did not return the weapon as he testified he did." I sub-

370

mit that hypothesis of innocence is blasted by the testimony and findings. Connor testified positively that he returned the pistol within an hour after it had been checked out to him, and the court-martial must have believed he told the truth for they found the accused guilty. Is that finding not supported by Connor's testimony?

Third, the next hypothesis of innocence offered by the majority is that the weapon must have been stolen from the orderly room between June 26, 1954, the date Connor returned the weapon, and sometime prior to June 29, 1954, the date when the accused came on the scene. The argument runs that the weapon was not logged in on the sign-in sheet and, applying the presumption of regularity, an assumption is made that it was not turned in to the arms room; that it was not permitted to kick around the orderly room; and that no one used it in the course of his duties during that three-day period. In my view, the argument founded upon the presumption of regularity is completely erroneous.

I agree that the sign-out roster—if it was an official record, and as I read the record it was not—evidences the fact that the appropriated pistol was not logged in when turned in to the arms room. In connection with its officiality, all I can ascertain from the record is that the arms attendant maintained a wall chart on which he entered his issuance and receipt of weapons. Whether the chart was a method devised by the attendant for his personal convenience or directed by someone else does not appear, and for the majority to label it as part of "the standing procedures of the arms room" does not clothe it with officiality. However, for my purpose, I will assume there was a duty imposed by a competent authority to maintain the roster. But I heretofore had not supposed that the presumption of regularity must be indulged in once a record is effectively rebutted by other evidence. In this case, Corporal Estacio, who was responsible for the arms room in June 1954, testified that he counted his weapons daily; that on June 28, 1954, all of

the pistols were in the arms rack; and that when he counted them on June 29, 1954, one was missing. Assuming more than is necessary, namely, that the chart disputes the testimony of the Corporal, the court-martial had the perfect liberty to discard it and accept the enlisted man's oral testimony. When there is a direct conflict in facts, the court-martial may choose which version it will accept.

Reduced to simplicity and considered at this level, this case amounts to no more than this: An Army .45 caliber pistol was admittedly misappropriated; the accused some 56 days later became a suspect because he had been seen in possession of that type of weapon when he should not have had it in his possession; when he was subsequently contacted by military authorities he admitted he knew where the weapon was and that he would have it returned to military authorities; and three days thereafter he was able to make delivery because the weapon fortuitously appeared under his pillow. Now, on the one hand, if the court-martial was compelled to believe accused's story that some unknown person placed the weapon under his pillow cover at just the convenient time and that he came into possession innocently, then reversal follows. On the other hand, if the court-martial could disbelieve his story and conclude reasonably that his explanation was unsatisfactory, affirmance follows. My associates chose the former, and I select the latter.

I would affirm the decision of the board of review.