UNITED STATES, Appellee

v

JAMES L. HUGGINS, Postal Clerk, Third Class, U. S. Navy, Appellant

12 USCMA 686, 31 CMR 272

*Lieutenant Colonel William H. Bennison,* USMC, argued the cause for Appellant, Accused.

*Major Elvin R. Coon, Jr.,* USMC, argued the cause for Appellee, United States.

## Opinion of the Court

QUINN, Chief Judge:

A Navy general court-martial convened at the Naval Air Station in Kenitra, Morocco, convicted the accused of four specifications of wrongful appropriation of money belonging to the United States Post Office Department and of one specification of unlawfully concealing a military post office record, in violation of Articles 121 and 134, respectively, Uniform Code of Military Justice, 10 USC §§ 921, 934. Intermediate appellate authorities affirmed the findings of guilty and the sentence, with some modification of the latter. Two issues are presented on this appeal. First, the accused contends the evidence is insufficient to support the findings of guilty of three of the four specifications of wrongful appropriation. In the second assignment of error he deals with a ruling by the law officer granting a continuance to the Government over a defense objection.

The accused and several other enlisted personnel were assigned as postal clerks to the Naval Air Station Post Office at Port Lyautey. On an irregular basis, different clerks were detailed to the money order section. According to prescribed procedures, at the end of each business day, the money order clerk was required to compute the number and amount of money orders sold, the amount of fees collected, and the amount of money paid out for cashed money orders and Treasury checks. The base post office figures and those of

its two field units were combined into a master report described as "POD Form 6019." The completed report and the excess of money received over money paid out were placed in the registered article safe for the night. The next day, a postal clerk, who was "not necessarily the clerk that made out the . . . report" would take the money to the base disbursing office, exchange it for a Treasury check, and return to the post office. It was then "the responsibility of the clerk in charge . . . to place the check with the . . . reports so that it could be audited and verified by . . . [the postal officer] later on in the day." Sometime during the day the postal officer would verify the report and check; he would sign the original and copy of the report; the original would be placed with the check in a sealed envelope. The envelope was registered, and the registration number noted on the copy of the report, which was then filed on a clipboard below the money order clerk's window. The registered envelope would be placed with other registered articles until it was transferred to the Fleet Post Office for dispatch to the New York Postmaster.

Prescribed procedures, however, were not followed. Three departures from "theoretical" operation merit special mention. First, the clerk in charge did not always receive the check from the postal clerk who effected the exchange at the disbursing office. Second, "there were times when" the postal officer signed the report before the money was

**687**

exchanged for the check and he did not thereafter see the report. Third, there were times when the disbursing office issued checks for "more than one day's business at one time."

Putting aside a persuasive argument by appellate defense counsel that there is nothing but suspicion to connect the accused with most of the records in evidence, we may assume the evidence is sufficient to show the following. As to specification 1: On October 25, 1960, the combined money order report in the amount of $625.88 was made out by the accused. The report was signed by the postal officer before the check was obtained from the disbursing office. A registration number was assigned to the report on October 27 by an unidentified person. The money was exchanged for a Treasury check at the disbursing office on November 7th and on the same day an envelope bearing the number given to the money order report was turned over to the Fleet Post Office. From the fact the accused was charged only with wrongful appropriation, it may be assumed the report and check were eventually received by the New York Postmaster.

As to specification 2: On November 3, 1960, postal clerk Miles prepared the combined report showing a prospective remittance of $528.62. It was signed by the postal officer before the money was exchanged for a check. On November 8, the accused issued a registration number for the report. The money was exchanged for the check at the disbursing office on November 21. There is no evidence that the registered envelope was turned over to the Fleet Post office, but apparently the report and remittance were received by the Postmaster.

As to specification 3: On November 18, 1960, a combined report showing an excess of money order receipts in the amount of $2,590.91 was prepared by postal clerk Miles. This report was also signed by the postal officer before the exchange check was obtained. On November 21, the accused issued a registration number for the report. However, the cash was not exchanged for a check until December 13, 1960.

Again there was no record of transfer of the registered envelope to the Fleet Post Office for transmittal to the New York Postmaster, but apparently the report and check were received by him.

Before trial, the accused was shown and examined a list of five instances in which there was a delay between preparation of the report and procurement of the exchange check. He said he had "no way of knowing now if . . . [he] was responsible for these delays" but to "the best of his knowledge" he was not responsible. He also denied he "deverted [sic] any of this Government money for personal use." Nevertheless, he was charged with wrongful appropriation of the money in three of the five cases of delay brought to his attention.

Although it was not specifically shown that the accused effected the check exchange in each instance, there is sufficient evidence from which this fact may reasonably be inferred. This circumstance, however, shows only that the accused had possession of the money on the date of the exchange. Since there is no evidence to show he wrongfully retained the check after he received it, the conviction for wrongful appropriation is sustainable only on the theory that he obtained and withheld the cash in each instance sometime between preparation of the combined report and procurement of the exchange check. Indeed, that was the theory on which the Government proceeded at trial. The evidence falls far short of showing such possession.

The two November transactions were conducted initially by Miles; he had the cash and he prepared the combined report. Thereafter, the postal officer assumed control. According to his own testimony, he was supposed to, and he implies that he actually did, check the report and count the proceeds on the next business day. There is absolutely nothing in the record of trial to show what happened after the postal officer completed his examination. We do not know whether the report was put back into the safe, or whether it was misfiled. True, the accused issued a reg-

istration number for each report sometime after it was prepared, but the evidence shows that the clerk who issued the registered article number was not required contemporaneously to effect the check exchange. No inference of possession of the money, therefore, can be drawn from the mere issuance of the registered article number. In short, there is just no evidence to indicate the accused had possession of the money at anytime before he took it to the disbursing office to exchange it for the Treasury check. Cf. United States v Valencia, 1 USCMA 415, 4 CMR 7.

The same substantial deficiency exists in regard to the October offense. Here again the postal officer presumably checked the report and the money the day after the accused compiled the combined report and placed it in the safe. There is no evidence to establish what the postal officer did with the money after he checked it. Perhaps it was replaced in the safe until it could be taken to the disbursing office. There is no evidence that thereafter the accused reacquired possession of the money. Certainly, he had access to the safe; but so did other members of the staff; and as far as the record reveals, the money never left the post office until the accused eventually took it to the disbursing office to obtain the customary check. Cf. United States v Moten, 6 USCMA 359, 20 CMR 75; United States v Duffy, 3 USCMA 20, 11 CMR 20.

Unquestionably, the base post office operated in a substantially different way from the "theoretical" standard for a postal facility, but the variations in procedure, which might have amounted to violations of the postal regulations for the issuing of money order receipts, do not show the accused unlawfully converted the receipts. As a matter of fact, it was not even shown that it was his specific responsibility to bring the money to the disbursing office at any particular time. United States v Doyle, 3 USCMA 585, 14 CMR 3, my separate opinion. Some suspicion of wrongdoing may perhaps be gleaned from the voluminous record, but the evidence falls short of proving the accused's guilt of the specifications in issue. United States v Duffy, supra.

We turn to the accused's second assignment of error with regret. The record of trial shows the law officer acted in this difficult case with skill and circumspection. But there was one lapse in his attentiveness to the rules of procedure. Unfortunately, that lapse was a serious one.

Met with a strong defense objection to the admission of certain evidence described by trial counsel as "one of the keys to this case," the Government moved for a continuance in order to obtain other evidence which might lay the proper foundation for the admission of the challenged evidence. The law officer regarded the application for a continuance as raising "a serious question." He recessed the court to take the matter "under advisement." The court was reconvened about one and one-half hours later. Over defense counsel's objection, the law officer granted the continuance. In the course of his ruling, he said that "after obtaining the counsel of the convening authority . . . [he] determined to grant the continuance." The accused raised the impropriety of the consultation with the convening authority before the board of review. The board of review concluded, however, that there was no error in the proceedings because "the ultimate decision" on the motion was made by the law officer. What the law officer and the board of review overlooked, however, is the accused's right to know, and to have the opportunity to rebut, the matters presented by the convening authority to the law officer. The accused is entitled to rulings free from the possible influence of the convening authority. While we are certain the motives of the law officer in this case were entirely opposite to those of the law officer engaged in the extracourt-room consultation before us in United States v Kennedy, 8 USCMA 251, 24 CMR 61, we cannot, within the rationale of that case, sanction a ruling projecting the important consequences attributed to it by the Government predicated upon a private conference with the convening authority. See also

United States v Cole, 12 USCMA 430, 31 CMR 16. If there were circumstances bearing upon the issue which the law officer concluded should have been brought to his attention, he should have had them presented in the proper way. The findings of guilty of the remaining charges and the sentence are set aside.

The decision of the board of review is reversed. The findings of guilty of specifications 1, 2 and 3, Charge I, are set aside and ordered dismissed. The findings of guilty of specification 4, Charge I, and Charge II and its specification are set aside; a rehearing of these charges may be ordered.

Judges FERGUSON and KILDAY concur.